IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:17CV286

| | |
|---|---|
| MARY McNEILLY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ALAN NORMAN, LIBERTY MUTUAL ) | |
| INSURANCE COMPANY, DURWIN BRICOE, ) | |
| DAVID GIBSON, A.D. McCRAY, BRITTANY ) | MEMORANDUM AND |
| MORTON, JAMES D. OAKS, JORDAN T. ) | RECOMMENDATION |
| PERKINS, M.R. USSERY, TODD A. WYLLIS, ) | |
| R.N. WESTBROOK, SOUTHERN HEALTH ) | |
| PARTNERS, INC., TERESA SMITH, ) | |
| CRYSTAL LAIL, PAMELA PATTERSON, ) | |
| and MANUEL MALDONADO, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

This matter is before the Court on a Motion to Dismiss (# 27) pursuant to Federal Rule of Civil Procedure 12(b)(6), which was filed by Defendants Crystal Lail, Manuel Maldonado, Pamela Patterson, Teresa Smith, and Southern Health Partners, Inc. (hereafter the "Motion Defendants"). The issues have been fully briefed, and the matter is now ripe for ruling. For the reasons addressed below, this Court will recommend that the Motion Defendants' Motion to Dismiss be granted.

**I.     Procedural Background**

On May 12, 2017, Plaintiff, on behalf of the Estate of Archie K. McNeilly, Jr. ("Archie"), filed this action originally in the General Court of Justice, Superior Court

Division, in Cleveland County, North Carolina under case number 17-CVS-816. Plaintiff named the following as defendants: Alan Norman, Liberty Mutual Insurance Co., Durwin Briscoe, David Gibson, A.D. McCray, Brittany Morton, James D. Oaks, Jordan T. Perkins, M.R. Ussery, Todd A. Wyllys, and R.N. Westbrook. Plaintiff did not allege medical malpractice. On September 8, 2017, Plaintiff filed an Amended Complaint.

On September 11, 2017, Plaintiff filed a second action, this one also in the General Court of Justice, Superior Court Division, in Cleveland County, North Carolina, under file number 17-CVS-748, which alleged wrongful death and violations of 42 U.S.C. § 1983 against Southern Health Partners, Inc., Teresa Smith, Crystal Lail, Pam Peretti, and Manuel Maldanado (the "Southern Health Partners Defendants"). This second action was filed after Plaintiff received a 120-day extension to extend the statute of limitations for her wrongful death claim pursuant to North Carolina Rule of Civil Procedure 9(j).

On October 16, 2017, Defendants Alan Norman, Liberty Mutual Insurance Co., Durwin Briscoe, David Gibson, A.D. McCray, Brittany Morton, James D. Oaks, Jordan T. Perkins, M.R. Ussery, Todd A. Wyllys, and R.N. Westbrook removed the original action to the United States District Court for the Western District of North Carolina.[1][2]

On November 28, 2017, Plaintiff dismissed the State court action (case number 17-

---

[1] The action was removed based on federal question jurisdiction. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); see also In re Blackwater Sec. Consulting, LLC, 460 F.3d 576, 584 (4th Cir. 2006) ("[F]ederal question jurisdiction is limited to actions in which the plaintiffs well-pleaded complaint raises an issue of federal law[.]") (citing Louisville & Nashville R.R. Co. v. Mottley, 211 U.S 149 (1908)).

[2] On October 13, 2017, Defendant Durwin Briscoe filed a Notice of Removal with this Court. See Not. Rem. (# 1). The other Defendants consented to the removal. Id. ¶ 4.

CVS-748) against the Southern Health Partners Defendants, pursuant to North Carolina Rule of Civil Procedure 41. On the same day, Plaintiff filed a Motion to Amend her Complaint in this action. On December 6, 2017, this Court granted Plaintiff leave to amend.

On December 7, 2017, the Second Amended Complaint (# 19) was filed, which added the Southern Health Partners Defendants. Plaintiff asserts causes of action against the Southern Health Partners Defendants pursuant to 42 U.S.C. § 1983. Plaintiff also asserts a state law claim for wrongful death, pursuant to N.C.G.S. § 153A-224, based on the supplemental jurisdiction of this Court.

On February 5, 2018, the Motion Defendants filed the instant Motion to Dismiss (# 27) and Memorandum in Support (# 28). Plaintiff filed a Response in Opposition (#29), and the Motion Defendants filed a Reply (# 30).

## II.    Factual Background[3][4]

The facts, viewed in a light most favorable to Plaintiff, are the following: On May 4, 2015, Archie was arrested. 2d Amend. Compl. (# 19) ¶ 25. Archie, a 40-year-old male, was obese and took medications for severe depression and bipolar disorder, which was disclosed to the admitting officer at the jail. Id. ¶¶ 27, 29. Archie also disclosed that he

---

[3] When evaluating this motion to dismiss, the Court must accept Plaintiff's alleged facts as true and view them in a light most favorable to her. See Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 181 (4th Cir. 1996). In this case, the facts are derived from Plaintiff's Second Amended Complaint (# 19).

[4] Plaintiff's factual recitation is based on records from the following: the State Bureau of Investigation, the Cleveland County Sheriff's Office, the Cleveland County Clerk of Court, and the North Carolina Department of Health and Human Services. 2d Am. Compl. (# 19) at 5 n.1. Plaintiff represents that her factual recitation is also derived from Archie's jail medical records. Id.

was being treated for an open skin wound and/or infection that might be MRSA. Id. ¶ 31.

Despite Archie disclosing this medical history, a jail supervisor was not asked to review his admission, and Archie was not referred to a mental health professional as required by jail policy. Id. ¶ 30. Archie was placed in a single-occupancy cell, cell B-102, so as to avoid infecting others. Id. ¶ 31.

Around 4:00 a.m. on May 6, 2015, Archie complained of chest pain. Id. ¶ 32. At the direction of Defendant Theresa Smith, Emergency Medical Services ("EMS") was contacted and came to the jail. Id. ¶ 32. EMS determined that Archie was not having a heart attack. Id. ¶ 32. Later that same day, Archie explained to Defendant Smith that his chest pain had not gone away. Id. ¶ 33.

In a sick call slip dated May 5, 2015,[5] Archie stated that his stomach could not hold anything, he had chills, he was hearing voices, and his back and leg were hurting from the open sores. Id. ¶ 35. On May 8, 2015, another nurse, Defendant Crystal Lail, saw Archie regarding his sick call complaint. Id. ¶ 36. Defendant Lail noted that Archie had refused three psychotropic medications on May 7 and May 8, 2015. Id. ¶ 37.

Archie was not seen by a doctor or a mental health professional. Id. ¶ 38. Defendant Lail, relying on a standing order, placed Archie on a clear liquid diet for 24 hours, to begin with breakfast on May 9, and Defendant Lail also asked Archie to start taking his medication again. Id. ¶ 39. The nurses did not follow up with Archie or enter any notes stating whether he began eating again or could hold food down. Id. ¶ 40. Archie did not

---

[5] The sick call slip could have been completed on May 8, 2015. Id. ¶ 35.

4

eat from May 10 through May 12, yet he continued to vomit or have dry heaves and have terrible diarrhea. Id. ¶ 41.

Archie was so weak that he began defecating on himself in his clothes. Id. ¶ 42 Archie would then strip off his clothing and sit naked in his cell. Id. ¶ 42. Other inmates told investigators they complained to Cleveland County Sheriff's Office ("CCSO") jailers over the last few days of Archie's life and asked that something be done. Id. ¶ 44. Archie wiped off the feces with the sheets and towels in cell. Id. ¶ 43. The CCSO jailers gave Archie replacement clothing and new sheets and towels. Id. ¶ 45. The jailers, however, left the soiled materials in Archie's cell, did not take him to the shower, and did not report his condition to the nurses. Id. ¶ 45.

The nurses came to Archie's cell at least twice a day to deliver medication. Id. ¶ 46. As Archie got weaker, the nurses had to actually come into his cell and provide him with his medicine. Id. ¶ 47. The nurses could see the condition Archie was in, but they did nothing to assist or document the conditions in his medical chart. Id. ¶ 47. Defendant Lail reported that she had been in Archie's cell several times, but she failed to document the condition he was in or note that his cell was filled with feces-soiled linens and clothing. Id. ¶ 48. Defendant Pamela Patterson had been in Archie's cell and was aware of the condition he was in. Id. ¶ 49. Defendant Smith, the head nurse, was also aware and told investigators she knew about the condition Archie was in. Id. ¶¶ 49-50.

The jail medical plan for the care of prisoners required that a physician come to the jail once per week, yet it had been months since a physician had come. Id. ¶ 51. Instead, a physician's assistant ("P.A.") came. Id. ¶ 51.

5

On May 11, 2015, P.A. Defendant Maldonado, came to the jail for a weekly visit. Id. ¶ 52. Defendant Maldonado did not see Archie. Id. ¶ 52. Defendant Maldonaldo reviewed Archie's chart and ordered that the nursing staff get bloodwork from Archie in order to check his Coumadin levels.[6] Id. ¶ 53.

On May 12, 2015, consistent with Maldonado's order, a nurse asked the jail staff to bring Archie to the nurse's station. Id. ¶ 54. Around 2:30 p.m., Defendant Jordan T. Perkins went to Archie's cell and saw that he was sitting on his bed without any pants. Id. ¶ 55. Defendant Perkins inquired why Archie was not wearing any pants, and Archie responded that he did not have any. Id. ¶ 56. Defendant Perkins gave Archie a clean pair of pants. Id. ¶ 57. When Defendant Perkins entered Archie's cell, he saw several pairs of pants, sheets, and blanks that were all smeared with feces. Id. ¶ 58. Defendant Perkins also saw that Archie's toilet was filled with feces and not working. Id. ¶ 60. Defendant Perkins called maintenance. Id. ¶ 60. The conditions Defendant Perkins noticed had existed for several days and had not been addressed by either the jail or nursing staff. Id. ¶ 61.

As Defendant Perkins and Archie walked to the nurses' station, Archie defecated in his pants. Id. ¶ 62. Defendant Perkins did not advise the nurses that Archie had used the bathroom on himself or that his cell contained soiled clothes and linens. Id. ¶ 63.

Archie defecated, again, while on the examination table. Id. ¶ 64. The nurses, Defendants Smith, Lail, and Patterson, responded angrily and did not clean Archie. Id.

---

[6] Archie took Coumadin to prevent blood clots. 2d Amend. Compl. (# 19) ¶ 53.

¶ 64. Archie tried to explain that he was extremely weak and could not get to the toilet. Id. ¶ 66. Archie also stated that he was too weak to stay on the exam table, and he asked to move. Id. ¶ 66.

Defendant Lail refused Archie's requests to be moved from the exam table. Id. ¶ 68. Defendant Perkins put his hands on Archie to keep him from getting off the exam table while Defendant Patterson attempted to draw Archie's blood. Id. ¶ 69. After two failed attempts to draw his blood, Archie was directed to return to his cell. Id. ¶ 70

Archie stated that he was too weak to walk back. Id. ¶ 71. One of the nurses provided Archie a walker. Id. ¶ 71. Archie seemed disoriented. Id. ¶ 72. Defendant Smith asked Defendant Perkins to get other officers to come assist Archie back to his cell. Id. ¶ 72. Three officers, including Defendant A.D. McCray, came to assist Archie. Id. ¶ 73.

As Plaintiff entered B-pod using the walker, he fell to the floor. Id. ¶ 74. Additional officers arrived to assist Archie, including Defendant R.N. Westbrook. Id. ¶ 74. Defendants Perkins and McCray directed Archie to get up, but he could not. Id. Defendants Smith and Lail, the nurses, came out from the nurse's station and claimed to take Archie's blood pressure. Id. ¶ 75. Defendants Smith and Lail then told the jailers, including Defendant Westbrook, that Archie was faking his illness in order to get a reduced bond. Id. ¶ 76.

Defendant McCray responded by yelling at Archie that he was faking and ordered him to get up. Id. ¶ 77. Officer Jones got a blanket or sheet and laid it on the ground. Id. ¶ 78. The officers rolled Archie onto the blanket or sheet and dragged him to his cell door. Id. ¶ 78.

The officers left clean clothing, but they did not stay to remove Archie's soiled pants or help him otherwise. Id. ¶ 80. Defendants Lail and Smith also did not assist Archie. Id. ¶ 80.

Someone unlocked[7] Archie's cell. Id. ¶ 81. Archie crawled onto his bed. Id. ¶ 82. Defendants Lail and Smith did nothing. Id. ¶ 83.

At the end of the day shift, Defendant McCray advised the oncoming night shift officers, including Defendants Brittany Morton and Wyllys, about Archie defecating on himself in the nurse's station and collapsing on the floor on his way back to the cell and being dragged back to his cell. Id. ¶ 84. Defendant McCray told Defendants Morton and Wyllys that Archie was faking his illness to get a reduced boned.[8] Id. ¶ 85.

Around 6:00 p.m., Defendant Lail contacted Plaintiff, Archie's mother, and asked if her son had hygiene problems and suffered from either diarrhea or nausea. Id. ¶ 86. Plaintiff responded that Archie showered daily, had good personal hygiene, and did not have a history of diarrhea or an inability to keep food down. Id. ¶ 87. Defendant Lail did nothing with this information. Id. ¶ 87.

Around 7:00 p.m., Defendant Morton accompanied Defendant Lail during the scheduled giving out of medication to the prisoners. Id. ¶ 88. When Defendants Morton and Lail got to Archie's cell, he was on bed and could not sit up, let alone come to the door to get his medicine. Id. ¶ 89. Defendant Lail reportedly told Defendant Morton that Arhie

---

[7] Plaintiff's Second Amended Complaint actually says "locked." 2d Am. Compl. (# 19) ¶ 81. Based on the context, it appears Plaintiff meant to assert <u>un</u>locked.
[8] This remark circulated to other officers on the night shift, who ignored and laughed at Archie as he was dying in his cell. 2d Am. Compl. (# 19) ¶ 85.

had walked to the nurse's station that afternoon, had gotten up after dropping to the floor on the way back to his cell, and was not getting up now merely to get attention. Id. ¶ 90.

Defendant Morton entered Archie's cell with Defendant Lail. Id. ¶ 91. Defendant Morton reported that Archie held out his hand, and she pulled him up to a seated position. Id. ¶ 91. Archie was still covered in feces and was breathing heavily. Id. ¶ 91. Defendant Lail asked Archie if he was able to take his medicine, but Archie's response was inaudible. Id. ¶ 92. Defendant Morton reported that Archie took the medicine from Defendant Lail and some water from Defendant Morton. Id. ¶ 92. As Defendants Lail and Morton were exiting Archie's cell, Defendant Morton made a loud gagging sound and laughed, mocking Archie. Id. ¶ 93. Defendant Lail told Defendant Morton to tell the B-pod officers to give Archie a shower, but he never got one. Id. ¶ 94.

The second shift was short at least four officers. Id. ¶ 95. This shortage was addressed by cutting out all cell checks and rounds. Id. ¶ 95. For an individual with mental illness, like Archie, the checks are required four times per hour. Id. ¶ 96

The printed electronic record from May 12, 2015 shows that no cells were checked in B-pod from the start of the second shift until Archie was found dead. Id. ¶ 98. To cover for the failure to perform required cell checks, Defendants M.R. Ussery and/or Wyllys made false log entries to give the appearance that the checks were performed. Id. ¶ 102.

At around 8:05 p.m., a B-pod inmate hit a call button to the control room and urged them to check on prisoner B-102. Id. ¶ 106. Defendant Todd A. Wylls left the control room to look in on Archie. Id. ¶ 107. Archie was found kneeling on the floor next to his bed, his arms were crossed on the bed, and his head was lying in his arms, as if he were

9

praying. Id. ¶ 107. Archie was naked and still had feces smeared on his body. Id. ¶ 108.

Defendant Wyllys radioed for other officers to come. Id. ¶ 109. Defendants Morton, Westbrook, James D. Oaks, and David Gibson all came to Archie's cell. Id. ¶ 110. They stood at the cell door laughing. Id. ¶ 111. Defendant Gibson thought Archie was breathing. Id. ¶ 111. Defendant Gibson stated that Archie was not his problem and said he would give any inmate three cigarettes to clean up Archie. Id. ¶ 111. The officers returned to their duties. Id. ¶ 112.

Around 9:30 p.m., an inmate hit the call button to the control room and told Defendant Wylls that he thought Archie was dead and someone needed to check on him. Id. ¶ 113. Defendant Wylls took a cigarette break. Id. ¶ 114.

Around 10:40 p.m., another inmate hit the call button to the control room to check on B-102. Id. ¶ 116. Defendant Wylls looked at Archie and called Defendant Gibson, his supervisor, to say that Archie had not moved in several hours. Id. ¶ 116. Defendant Gibson called Defendant Oaks to ask him to tell the nurse to come check on Archie. Id. ¶ 117.

At around 10:45 p.m.[9], Defendant Lail entered Archie's cell with Defendant Deputy Westbrook. Id. ¶ 118. Archie was dead. Id. ¶ 119. Archie's body was cold to the touch, stiff, and discolored. Id. ¶ 119. EMS was called and arrived shortly after 11:00 p.m. Id. ¶ 120. An autopsy revealed a large kidney stone and infection that caused renal failure. Id. ¶ 121.

## II. Legal Standard

---

[9] The Second Amended Complaint does not specifically state "p.m.," but from the context it appears clearly to have been p.m. 2d Am. Compl. (# 19) ¶ 118.

The central issue for resolving a Federal Rule of Civil Procedure 12(b)(6) motion is whether the complaint states a plausible claim for relief. See Francis v. Giacomelli, 588 F.3d 186, 189 (4th Cir. 2009). In considering a defendant's motion, the court accepts the allegations in the complaint as true and construes them in the light most favorable to plaintiff. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Giacomelli, 588 F.3d at 192. Although a court accepts well-pled facts as true, it is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192.

The claims need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a cause of action. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Consumeraffairs.com, 591 F.3d at 256. "[A] formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Nor will mere labels and legal conclusions suffice. Id. Federal Rule of Civil Procedure 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; accord Consumeraffairs.com, 591 F.3d at 255. The mere possibility that a defendant acted unlawfully is not sufficient for a claim to survive a motion

to dismiss. Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193. Ultimately, the well-pled factual allegations must move a plaintiff's claim from possible to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

**III. Discussion**

**Plaintiff cannot circumvent 28 U.S.C. § 1441 by voluntarily dismissing an action she brought in State court and then attempting to add these same defendants to an action she brought in federal court.**

The Motion Defendants argue that they are not proper parties to be joined in the instant action because Plaintiff has improperly attempted to circumvent 28 U.S.C. § 1441 by joining them in this case. Defs.' Mem. Supp. (# 28) at 4. In particular, the Motion Defendants contend that Plaintiff originally filed a case against the Southern Health Partners Defendants in State court under case number 17-CVS-816, but Plaintiff subsequently voluntarily dismissed the case on November 28, 2017. Id. The Motion Defendants further contend that Plaintiff then filed a Motion to Amend her Complaint to add the Southern Health Partners Defendants to the present action, which this Court granted. Id. at 4-5. Relying on American Int'l Underwriters (Philippines), Inc. v. Continental Ins. Co., 843 F.2d 1253, 1260 (1988), the Motion Defendants conclude that dismissal of this case is warranted. Id. at 5. The Court agrees.

The right to remove a case from State to federal court derives from 28 U.S.C. § 1441, which states, in pertinent part, that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a); see

12

Mulcahey Columbia Organic Chems. Co., Inc., 29 F.3d 148, 151 (4th Cir. 1994) ("The burden of establishing federal jurisdiction is placed upon the party seeking removal."). The plaintiff may not circumvent 28 U.S.C. § 1441(a) by filing a case in State court and then refiling an identical case in federal court to circumvent the limitation on removal only by defendants. American Int'l Underwriters (Philippines), Inc., 843 F.2d at 1260 (citing Shamrock & Oil and Gas Corp. v. Sheets, 313 U.S. 100 (1941)).

In American Int'l Underwriters, the plaintiff originally filed a case in State court and then refiled an identical case in federal court, both alleging the same claims against the same party. 843 F.2d at 1255-56. The Ninth Circuit recognized that the congressional intent behind 28 U.S.C. § 1441 was "to require the Plaintiff to abide by his selection of a forum." Id. at 1261. The Ninth Circuit also recognized that based on the congressional intent behind 28 U.S.C. § 1441, "a plaintiff should not be permitted to alter the forum that it selects to litigate its claims against a particular defendant." Id. The Ninth Circuit concluded that a plaintiff may not file a "repetitive lawsuit" in federal court to circumvent the removal statue, which limits removal to federal court only by a defendant. Id.

In the instant case, Plaintiff chose to file her case in a State forum in two distinct actions. Plaintiff should not be allowed to use the tactic of voluntary dismissal and attempted joinder of the Southern Health Partners Defendants to her federal case to circumvent 28 U.S.C. § 1441(a) and to change the forum, where Plaintiff had the choice of forum from the outset. If this Court allows Plaintiff to dismiss her State court action and refile an identical case in federal court, it would permit forum shopping and disregard the congressional intent behind 28 U.S.C. § 1441(a).

Plaintiff's attempt to join the Southern Health Partners Defendants, after taking advantage of remedies available only in State court by receiving a 120-day extension to extend the statute of limitations under North Carolina Rule of Civil Procedure 9(j) so that she could file the State court action against these defendants originally, and then dismissing the action in State court is a clear attempt to circumvent 28 U.S.C. § 1441(a), which limits removal only to defendants. Consequently, Plaintiff's Second Amended Complaint must be dismissed.[10]

## IV. Conclusion

In light of the foregoing, the Court RECOMMENDS that the Motion Defendants' Motion to Dismiss (# 27) be GRANTED, and this case be dismissed without prejudice to filing a complaint in state court.

Signed: May 8, 2018

Dennis L. Howell
United States Magistrate Judge

---

[10] Having concluded that dismissal of the case is warranted, the undersigned has not addressed the Motion Defendants' alternative argument that Plaintiff's wrongful death claim is time-barred. See Mem. Supp. (# 28) at 7-11.

## **Time for Objections**

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).

15

Case 1:17-cv-00286-MR-WCM   Document 31   Filed 05/08/18   Page 15 of 15